EXHIBIT C

Case 1:04-cv-10594-DPW   Document 13-4   Filed 10/22/2004   Page 2 of 5

# tax analysts
Respectfully disagreeable since 1970.

# tax notes

Volume 101, Number 2 ■ October 13, 2003

**SPECIAL REPORTS**
- LILOs: IRS Fantasy World Collides With Leasing Reality ............ 249
- NYSBA Weighs In on JGTRRA's Dividend Provisions. .............. 273

**ANALYSIS**
- General Motors: World's Largest VEBA? ............................ 183
- ETI Act Repeal Battle Turns K Street Into Easy Street. .............. 189

**CONGRESS**
- House GOP Sweetens ETI Act Repeal for Manufacturers ............ 175
- Congress Takes a Rest From Race to the Finish .................... 178
- Nickles Will Retire at End of 2004 ................................ 180
- Finance Tries to Close SUV-Size Loophole ......................... 197

**IRS**
- Service Will Accept More Forms by Fax ............................ 181
- Everson Taps Klotsche as Senior Adviser .......................... 182
- Happy Birthday: Income Tax Turns 90 ............................. 196
- EO Division Gets Serious About Antiterrorism ..................... 198

**TREASURY**
- Officials Review Like-Kind Exchange, Partnership Guidance ......... 200
- Consolidated Return Guidance Highlighted ........................ 202
- Treasury Reconsiders Loss Disallowance Regs ..................... 203

**COURTS**
- IRS Properly Withheld Records From Judicial Watch ................ 233
- Eighth Circuit Affirms Levy on Bankruptcy Exempt Assets .......... 234

**PRACTICE**
- Taking the Luster Out of Golden Parachutes ....................... 243

**COMMENTARY**
- Tax Expenditures: Revenue Loss vs. Outlay Equivalents ............ 287
- Taking the Power Ball Annuity? Take a Look at *Ithaca Trust* ........ 289

**DEPARTMENTS**

| | |
|---|---|
| Calendar. ........................... 293 | IRS Letter Rulings. ................... 225 |
| Chief Counsel Advice. ................ 225 | IRS News ............................ 219 |
| Code Section Index. .................. 296 | IRS Regulations. ..................... 215 |
| Congressional Press Releases ......... 240 | IRS Tax Correspondence ............. 220 |
| Congressional Tax Correspondence ... 241 | JCT Reports. ........................ 241 |
| Court Opinions ...................... 229 | News in Brief ....................... 206 |
| Focus on Congress. ................... 239 | Practice News ...................... 243 |
| Focus on the IRS. .................... 219 | Special Reports. ............... 249, 273 |
| Focus on Treasury ................... 209 | Summary of Contents. ............... 170 |
| GAO Reports ........................ 241 | Tax Facts ........................... 287 |
| Internal Revenue Bulletin. ............ 223 | This Week's Tax News .............. 173 |
| IRS Chief Counsel Notices. ........... 228 | Viewpoints ......................... 289 |

# analysts viewpoints

## The Lottery Cases and *Ithaca Trust*

### By Wendy C. Gerzog

*Wendy C. Gerzog is a Professor at the University of Baltimore School of Law. This article summarizes a portion of the author's forthcoming article to appear in the Real Property, Probate, and Trust Journal (Winter 2004).*

Recently, the Second Circuit reversed the Tax Court in *Gribauskas*[1] and held, like the Ninth Circuit in *Shackleford*,[2] that the value of an annuity computed under the actuarial tables had to be discounted to reflect lack of marketability because, without that adjustment, the value of the remaining lottery payments did not reflect fair market value. The Second Circuit, like the Ninth Circuit, held that valuing the decedent's lottery winnings under the tables was erroneous where the taxpayer "provided a more realistic and reasonable valuation method."[3] The actual fair market value in *Gribauskas* was 26 percent, and in *Shackleford* was 50 percent, less than the amount computed under the tables.[4]

In 1929, the Supreme Court decided *Ithaca Trust*. *Ithaca Trust* involved the value of an estate tax charitable deduction where a noncharitable interest, a life estate, preceded the donation to a charity. The widow actually died within six months of the decedent's death so that the amount that she actually received from the trust was in fact only 8 percent of the value of her life estate as calculated under the actuarial tables.[5] Yet the Court held that, "Tempting as it is to correct uncertain probabilities by the now certain fact, we are of the opinion that it cannot be done, but that the value of the wife's life interest must be estimated by the mortality tables."[6]

It is this author's contention that *Ithaca Trust* holds that when valuation must be computed by actuarial methods, all facts, except for those necessary to use the tables, must be ignored.[7] This requirement is so despite the fact that an actual facts-and-circumstances analysis would likely produce a more realistic result.

Consider that the life expectancy of a 50-year-old individual is 29 additional years; however, only 3 percent of those individuals will actually die during the year they are 79 years old.[8] Even people who are expected to die at or between ages 74 and 83 represent only 30 percent of this group. Regarding a lifetime annuity with an expected present value of $100,000, assuming a fixed interest rate of 5 percent, the probability that a 50-year-old, using the same interest rate, would receive between $90,000 and $110,000, in present value payments, is only 27 percent.[9] Moreover, these computations assume a constant interest rate over an individual's lifetime — something no one expects to occur. Essentially, it is the nature of actuarial valuation that, except in the "average" case, a facts-and-circumstances analysis will almost always reflect a more accurate fair market value. Their appeal is their simplicity and their universal application, not their equivalence to fair market value in a particular case.

The actuarial tables are mandated in the lottery cases as the unpaid lottery installments are in the nature of an annuity.[10] Section 7520 is clear: The actuarial tables are required to be used to value annuities. The

---

[1]*Gribauskas v. Commissioner*, 116 T.C. 142, *Doc 2001-6997 (39 original pages), 2001 TNT 47-17* (2001), *rev'd* 342 F. 3d 85, *Doc 2003-19321 (8 original pages), 2003 TNT 167-12* (2d Cir. 2003).

[2]*Shackleford v. United States*, 262 F.3d 1028, *Doc 2001-22753 (11 original pages), 2001 TNT 169-5* (9th Cir. 2001), *aff'g* 84 AFTR2d par. 5902, 99-2 USTC P60,356, *Doc 98-25602 (17 pages), 98 TNT 157-7* (E.D. Cal. 1998).

[3] 342 F.3d at 88, citing *Shackleford* (262 F.3d at 1033).

[4]*See Estate of Gribauskas v. Commissioner*, 342 F.3d 86-87 (2d Cir. 2003) (wherein the fair market value of the Lotto prize was determined to be $2,603,661.02 (approximately 74 percent of the actuarial amount) instead of $3,526,058.22 as determined under the actuarial tables) and *Shackleford v. United States*, 262 F.3d 1028, 1030 (9th Cir. 2001) (wherein the estate discounted the amount calculated under the tables ($4,023,903) to almost one-half of that amount ($2,012,500)).

[5]"The value of a life estate in $347,244.51 to a person 61 years of age (as shown by the mortuary tables prescribed by the Treasury Department of the United States) is $126,329.64." *Ithaca Trust Co. v. United States*, 64 Ct.Cl. 686,

(Footnote 5 continued in next column.)

688-689 (1928), *rev'd* 279 U.S. 151 (1929). However, the actual income paid to the widow because of her early death amounted to $10,110.04. *Id*. at 688.

[6] 279 U.S. at 155.

[7]*See* Wendy C. Gerzog, "*Ithaca Trust* and Section 2053: Smith, McMorris, and O'Neal," *Tax Notes*, Apr. 22, 2002, p. 570.

[8] Life expectancies were calculated using the Treasury Department's Table 90 CM, IRS Publication 1457, *Actuarial Values, Book Aleph* (7-1999).

[9] Approximately two-thirds (64 percent) will receive between $80,000 and $120,000; about three-fourths (78 percent) will receive between $75,000 and $125,000. A significant number of people will actually receive a much different annuity amount from the average 50-year-old — assuming a constant interest rate over the life of that individual, which again, is inherently unrealistic.

[10]*See Estate of Gribauskas v. Commissioner*, 116 T.C. 142, 158 (2001); *Estate of Shackleford v. United States*, 99-2 USTC P60,356, P60,357, 84 AFTR2d par. 5902, 5906 (E.D. Cal. 1999) ("9. The full present value of the Shackleford lottery prize is properly included in the gross estate of Thomas Shackleford under the provisions of 26 U.S.C. Secs. 2033 and 2039.").

statute specifies only one exception, for some pension plans, and states that the government may enunciate other exceptions in its regulations.[11] Besides listing certain code sections for which section 7520 is inapplicable[12] that are not pertinent here, the regulations allow a departure from the tables only where fair market value is, or could approximate, zero.[13]

In *Shackleford*, the district court held "that, at least during the interim period prior to the publication of final regulations..., the case law developed prior to [the current section 7520] was still applicable."[14] However, prior case law is clearly embodied in the regulations. For example, for annuities, the regulations provide for an exception to the use of the tables where " ... [t]he governing instrument [cannot] ensure that the annuity will be paid for the entire defined period."[15] This regulation reinforces the Eighth Circuit's holding in *O'Reilly*,[16] a case cited by both the Second and the Ninth Circuits. In *O'Reilly*, the actual dividends for the term of the trust amounted to $1,800 — less than 2 percent of the value estimated under the actuarial tables ($100,821).[17]

Likewise, under the regulations, an annuity trust that is expected to expend the entire corpus[18] before all payments can be made must be recalculated as an annuity "with the term of years determined by when the fund will be exhausted by the annuity payments."[19] This exception to the use of the tables confirms the result in *Froh*,[20] a gift tax case in which the parties agreed that the gas reserves, and hence the income stream, would be exhausted before the end of the term of the trust.

In the context of the "principles of the law of trusts," the regulations refer to restricted income and remainder interests that may not be valued under the tables.[21] The examples refer to a discretionary power of invasion[22] and a power to consume[23] that can completely destroy the beneficiary's interest. In one example, "the exercise of the power could result in the termination of the income interest at any time"[24] and, in another, "the exercise of the power could entirely exhaust the remainder interest."[25] Again, the regulations do not allow actuarial valuation in instances where the interest could be totally eliminated.

According to both the Second and the Ninth Circuit opinions, the right to transfer property is a basic characteristic of a property interest.[26] Where that right is restricted, these courts reasoned, the regulations require that valuation must reflect that limitation. However, the discussion of "restrictions" as used by the regulations refers to limitations in trust agreements that can completely defeat a beneficiary's interest. There is no mention of restrictions, or an exception, for lack of marketability in the regulations or in case law.

Moreover, despite the Second and Ninth Circuits' emphasis that transferability is "'one of the most essential sticks in the bundle of rights that are commonly characterized as property,' and that an asset subject to marketability restrictions is, as a rule, worth less than an identical item that is not so burdened,"[27] for transfer

---

[11]Section 7520(b). Reg. sections 20.7520-3, 25.7520-3. *See* Conf. Rep. No. 1104, 100th Cong. 2d Sess. 113 (1988); T.D. 8630, 60 FR 63913 (1995).

[12]*See* reg. section 1.7520-3(a)(1)-(8) (*e.g.*, sections 7872, 2702(a)(2)(A)); reg. section 20.7520-3(a)(1)-(8), reg. section 25.7520-3(a)(1)-(8). The regulations conclude the list with "[a]ny other sections of the Internal Revenue Code to the extent provided by the Internal Revenue Service in revenue rulings or revenue procedures [citations omitted]." Reg. sections 1.7520-3(a)(9), 20.7520-3(a)(9), 25.7520-3(a)(9). Reg. section 20.7520-3(a), is applicable to decedents dying after May 1, 1989, and reg. section 20.7520-3(b), is applicable to decedents dying after December 13, 1995. *See* reg. section 20.7520-3(c). *See* T.D. 8540, *amended by* T.D. 8630. The district court in *Shackleford* held that the regulations were inapplicable to the instant case. *See Estate of Shackleford v. United States*, 98-2 USTC P60,320, at 86,531, 82 AFTR2d par. 5538, 5543.

[13]*See* reg. sections 20.7520-3(b)(2)(v), Example 1 Unproductive Property (where a beneficiary does not have the right to make the corpus productive); Examples 3 and 5 (where A's child's income interest could be terminated at any time for any reason), and 20.7520-3(b)(3) (where the measuring life is terminally ill (defined as being a greater-than-50-percent probability that the individual who is the measuring life will die within a year of decedent's death) or died in a common accident with decedent).

[14]*Estate of Shackleford v. United States*, 98-2 USTC P60,320, at 86,531, 82 AFTR2d par. 5538, 5543.

[15]*See* reg. section 20.7520-3(b)(2)(i). *See also* reg. sections 1.7520-3(b)(2)(i), 25.7520-3(b)(2)(i).

[16]*O'Reilly v. Commissioner*, 95 T.C. 646 (1990), *rev'd* 973 F.2d 1403 (8th Cir. 1992).

[17]973 F.2d at 1408. Currently, the regulations require that the transferor show a clear intention to "provide an income interest for the income beneficiary during the specified period of time that is consistent with the value of the trust corpus and with its preservation." Reg. section 20.7520-3(b)(2)(ii)(A).

[18]The regulations provide a method to determine whether that condition exists in a particular situation. *See* reg. section 20.7520-3(b)(2)(i).

[19]Reg. section 25.7520-3(b)(2)(v), Example 5(ii).

[20]*Estate of Froh v. Commissioner*, 100 T.C. 1, 93 TNT 5-15 (1993), *aff'd in an unpublished opinion* 46 F.3d 1141, Doc 95-1890, 95 TNT 27-16 (9th Cir. 1995).

[21]Reg. sections 20.7520-3(b)(2)(ii)(A) and (B).

[22]Reg. section 20.7520-3(b)(2)(v), Example 3. ("In this case, because the trustee's power to invade trust corpus is unrestricted, the exercise of the power could result in the termination of the income interest at any time. Consequently, the income interest is not considered an ordinary income interest for purposes of this paragraph, and may not be valued actuarially under this section.").

[23]Reg. section 20.7520-3(b)(2)(v), Example 5. ("In this case, the surviving spouse's power to consume the corpus is unrestricted, and the exercise of the power could entirely exhaust the remainder interest during the life of the spouse. Consequently, the remainder interest that is includible in the child's estate is not considered an ordinary remainder interest for purposes of this paragraph and may not be valued actuarially under this section.").

[24]*See* note 22 *supra*.

[25]*See* note 23 *supra*.

[26]262 F.3d at 1032. The Second Circuit in *Gribauskas* agreed with the Ninth Circuit's description ("In arriving at its holding, the court correctly observed that the 'right to transfer is one of the most essential sticks in the bundle of rights that are commonly characterized as property,' and that an asset subject to marketability restrictions is, as a rule, worth less than an identical item that is not so burdened." 342 F.3d at 88, citing *Shackleford*, 262 F.3d at 1032).

[27]342 F.3d at 88, citing *Shackleford*, 262 F.3d at 1032.

tax purposes, lack of marketability is treated as an issue of valuation and does not effect a diminished property interest, such as half of a 20-year term interest, but is merely a reduction in the fair market value of the property. That reduction is relevant only when valuation is computed by a facts-and-circumstances method of valuation,[28] but is not relevant when valuation is calculated on the basis of the annuity tables.[29]

Finally, according to the regulations, the mortality component of actuarial tables may not be used where the individual who is the measuring life is "terminally ill" at the decedent's death.[30] In the instance of a common death of both the decedent and the measuring life, the regulations state that the tables are likewise inapplicable.[31] Lion[32] accords precisely with an example in the regulations that requires a departure from the tables[33] because the wife's life estate was valueless.

The circuit courts cited to such cases as *O'Reilly*, *Lion*, and *Froh* as support for their approach and as examples of the government's alleging a departure from the tables to correspond with economic reality.[34] In *Lion*, *Froh*, and *O'Reilly*, however, the words "unrealistic" and "unreasonable" translated to a zero or almost zero value, the approach incorporated in the regulations. By contrast, in *Shackleford*, the lack of marketability reflected approximately a 50 percent reduction in value; in *Gribauskas*, the discount amounted, approximately, to only a 26 percent diminution.

### Most significantly, the circuit courts are ignoring the holding in Ithaca Trust.

Most significantly, the circuit courts are ignoring the holding in *Ithaca Trust*. *Ithaca Trust* underlines that the mandate to use actuarial tables should not be disregarded even where the tables produce "unrealistic" results. Essentially, allowing *any* adjustment to the value determined by the tables in the lottery cases contravenes the legislative mandate of their use. In *Ithaca Trust*, the widow's annuity was actually worth only about 8 percent of the value calculated under the annuity tables; however, because the tables were mandated, the Court required the life estate's actuarial value to be used without modification. Certainly, *Gribauskas* and *Shackleford* do not present facts more compelling than *Ithaca Trust*.[35]

---

[28]See, e.g., TAM 9207004 (The fair market value of marijuana is its street value); TAM 9152005 (The estate tax value of stolen art objects is its highest price in a discreet retail market or in the legitimate art market). William J. Turnier, "The Pink Panther Meets the Grim Reaper: Estate Taxation of the Fruits of Crime," 72 *N. Car. L. Rev.* 163 (1993). In the income tax context, see, e.g., *Jones v. Commissioner*, T.C. Memo. 1991-28.

[29]*Ithaca Trust v. United States*, 279 U.S. 151 (1929) (in *Ithaca Trust*, the Court held, "Tempting as it is to correct uncertain probabilities by the now certain fact, we are of the opinion that it cannot be done, but that the value of the wife's life interest *must be estimated by the mortality tables* [emphasis added]." 279 U.S. at 155); *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933) (in *Sinclair Refining Co.*, the Court explained, discussing *Ithaca Trust*, "The intention of the lawmakers was held to be that the computation of the tax should be made as of the death of the testator *on the basis of a law of averages* [emphasis added]." 289 U.S. at 698).

See also *Estate of Young v. Commissioner*, 110 T.C. 297, 316 (1998) (wherein, in another connection but for similar reasons, the taxpayer was denied a lack of marketability discount as well as a fractional interest discount to value property included under section 2040 because that statute provides for artificial inclusion rules). See generally Wendy C. Gerzog, "Contingencies and the Estate Tax," 5 *Fla. Tax Rev.* 49 (2001).

[30]Reg. section 20.7520-3(b)(3)(i). However, there are exceptions to this rule; for example, the value of the decedent's reversionary interest under sections 2037(b) and 2042(2) are determined without regard to health. See reg. section 20.7520-3(b)(3)(ii). Reg. section 20.7520-3(b)(3)(i). "Terminally ill" is defined as being "known to have an incurable illness or other deteriorating physical condition . . . [where] there is at least a 50 percent probability that the individual will die within 1 year." The exception for terminal illness embodies the historically applied exception in Rev. Ruls. 80-80, 1980-1 C.B. 194, and 66-307, 1966-2 C.B. 429. In Rev. Rul. 80-80, the IRS revised its earlier ruling to reflect the fact that intervening case law focused principally on whether death was "imminent" in absolute, instead of relative, terms.

[31]Reg. section 20.7520-3(b)(3)(iii). See *Estate of Harrison v. Commissioner*, 115 T.C. No. 13, *Doc 2000-21902* (18 original pages), 2000 TNT 164-6 (2000).

[32]*Estate of Lion v. Commissioner*, 438 F.2d 56 (4th Cir. 1970), aff'g 52 T.C. 601 (1970).

[33]Reg. section 20.7520-3(b)(4), Example 2. Indeed, the regulations require that the tables not be used "even if it was established that the spouse survived the decedent." *Id.*

[34]The Ninth Circuit in *Shackleford* cited to all three of these cases. 262 F.3d at 1033. The Second Circuit cited to *O'Reilly* and *Froh*. 342 F.3d at 87-88. The circuit court in *Gribauskas* also cited to *Berzon v. Commissioner*, 534 F.2d 528 (2d Cir. 1976) (zero income production sufficient to require nonapplication of the tables), and to *Estate of Jennings v. Commissioner*, 10 T.C. 323 (1948) (life expectancy of less than one year justified departure from tables) as well as to the Ninth Circuit's opinion in *Shackleford*. 342 F.3d at 88.

[35]The Ninth Circuit sympathized that the estate tax was computed on the present value of the future payments while the estate did not actually receive those payments until an installment was due. This result is, of course, common to all annuities, but the hardship is more keenly felt where the decedent's wealth is wholly due to winning the lottery and, as such, his principal asset is anticipated lottery payments. In such a case, the usual planning techniques include insurance in an amount sufficient to cover the estate tax liability.

Another solution to this issue is to enact a statute that would provide a delay in the collection of estate taxes such as that found in section 6163 or an option for installment payments like that offered by section 6166. With a payment plan such as provided in these sections, the estate of the lottery winner, who died after receiving only a few payments and who has little other property in his estate, could more easily pay its taxes. The situation in the lottery cases is not unlike those addressed by sections 6163 and 6166, which were enacted to avoid hardship where an asset was includible in the estate but was not easily marketable. See S. Rep. No. 665, 72d Cong., 1st Sess. (1932), *reprinted in* 1939-1 C.B. 457, 535 (1939) (section 6163); H. Rep. No. 2198, 85th Cong., 2d Sess. 7 [Part I, Sec. 6] (1958) (section 6166).